Case number 11-1483 et al. Independent Pilots Association petitioner versus Federal Aviation Administration. Mr. Pills for the petitioner, Mr. Pinnock for the respondent, and Mr. O'Quinn for the intervener. Good morning. May it please the court, Eric Pills for petitioner. With me at council table is my colleague Steve Vossett and IPA General Counsel Bill Trent. Also in the courtroom are Bob Travis and a number of other pilots representing the other 2,500 professional pilots represented by the FAA. Congress told the FAA to issue regulations based on the best available scientific information to address problems of pilot fatigue. The FAA's 2011 decision to exclude cargo operations from that rule, based solely on a cost-benefit analysis, violates that straightforward command because it left cargo pilots subject to the old Part 121 regulations that the FAA admits are not based on the best available scientific information. And further admits do not adequately address the problem of pilot fatigue. In addition to a sharp departure from the FAA's past practice of treating all pilots under the same basic safety and health rules, regardless of the nature of operation, the FAA's decision ignores its own scientific determinations that fatigue affects all pilots in the same manner, regardless... And they didn't ignore it, did they? Well, Your Honor, what I mean by that is in making the decision... What you mean by that is they didn't ignore it. Don't tell us something that is refutable in the record. Make your argument based on the real record. We lack honesty. I appreciate that, Your Honor. What I meant by that was that the decision to exclude the cargo based only on the cost-benefit analysis ignored the science that Congress... They didn't ignore it. It apparently decided that it was outweighed by the cost-benefit. I take your point, Your Honor. The point was the decision to exclude cargo pilots was not based on the science, which is what Congress... But the statute doesn't require that. Yeah. What's the last paragraph of the instructions to the... The last paragraph says that in issuing the regulations, the administrator may consider any other matter that he deems necessary or appropriate to issue the regulations. And the key, I think, to that point is to look at the actual language of the statute, which makes it clear that the list... But that's part of the language of the statute. It is. Absolutely, Your Honor. But it's limited in scope because the entire list in subsection 2 is designed to inform the administrator's decision to issue regulations based on the best available science. I don't think that's correct, what you just said. If you look at subsection G, it's tab 5. Yes. Yeah. Do you have it? I do, Your Honor. Okay. And that says take into account international standards regarding flight schedules and duty periods, correct? Yes. The international standards are based on not only the science regarding fatigue, but also costs. Are you aware of that? Not specifically, Your Honor, but... The International Civil Aviation Organization, which is a UN body, takes into account or devises standards designed to support safe, efficient, and economically sustainable civil aviation. The International Federation of Air Pilots Association also says that operators should seek to achieve a realistic balance between safety, productivity, and costs. So not all the factors deal only with science. One of the factors, before you even get to the catch-all, deals with cost effectiveness. And I think the point, though, that I'm making, that may... I don't... Obviously, I don't disagree with what you're saying, Your Honor. But what Congress wrote in this statute is that all of the factors that they list, including the international standards, are to inform the FAA's decision about making the regulations based on the best available scientific information. Yeah, but see, if you were right, Ann would have said any other related matters or any other scientific matters. But it says any other... any, any, any other matters that he considers appropriate. I mean, we deal with statutory language all the time. That's about as broad as it gets. Well, two points, Your Honor. First, as I said... Some people would probably argue it's unconstitutionally broad. But it is very broad. Except that, number one, it's limited by the matters that precede it and the context in which it's offered. What makes you think that? It says any other matter. The words any other would suggest, if I say to you, you have to do 1 through 10 and anything else you want, what makes you think that that's limited by 1 through 10? It says any other. Because this court's precedent on similar kinds of... on similar language and cases has made clear that to take one term in isolation without considering the context of the statute and the overall purpose of the statute is improper. And here you're taking this one phrase at the end of this list of factors that the agency may consider in order to issue regulations based on the best available science and say, in effect, you can ignore the science, you can put it to the side and base your decision on something else. And that doesn't make, I don't think, any sense under the structure and intent of the statute and essentially creates a loophole that swallows the entire rule. I think you're overstating your case when you say they ignored the science. They certainly considered the science. I don't see how you can make the claim that they didn't. Your Honor, I'll... This doesn't make a difference. I'm not... I am quibbling with the words because I really get ticked off at lawyers who tell me lower bodies ignored something they didn't ignore. My point... It's not just a quibble. We have a standard of review that involves arbitrary and capricious, and perhaps if you could credibly say they ignored it, that might help you get toward that standard. And again, all I mean is that in basing the decision only on cost-benefit, they forget the scientific reasons for the rule as it applied to everyone else, and that's my only point on that. They certainly did consider the science in issuing the Part 17 rules or formulating them, but then they turned their back on that science when they said, but we're not going to apply it to cargo only because of cost. Because we're going down to the other factors raised by Judge Randolph and the other factors in the catch-all paragraph and deciding that they weigh enough to exempt this portion. But again, to read that catch-all provision as allowing the consideration... As allowing the decision to be based on something other than the best available scientific information is squarely inconsistent with the operative part of the statute in subsection A, and would allow essentially the tail wagging the dog. A small catch-all provision that's essentially saying, Congress, there may be other things that may help you, Administrator, issue decisions based on the best available scientific information. We don't pretend to know everything. You can consider those. But to take something that has nothing to do with science, with nothing to do with addressing the problem of fatigue, and saying that you can not only consider it, but base your decision on it, I think goes way too far. And as the cases we cite in our brief, the court has cautioned against using that kind of approach to take a broad or ambiguous term in isolation. What's the closest case that you have to this? I think the public citizen v. NRC case at 901 F. 2nd 157 is one. Tell me about what it said and what the circumstances. The language here says, but in this case, the NRC has taken the impermissible step of plucking the ambiguous term out of its context in the statute, interpreting it in a vacuum, and then twisting the meaning of the unambiguous term in the statute to fit its interpretation of the ambiguous one. Is that what you're saying happened here? Yes. You're saying they interpreted an ambiguous statute in a way that was not contextually acceptable? I think the ambiguous term, the all necessary matters, which is broad. That depends on your company in chief's argument. Yes, it does, in part, and also maybe more fundamentally in the operative language of subsection A itself, which, again, fundamentally directs the FAA to issue the regulations based on the best available scientific information. Read me the most specific command about the best scientific. In the statute? Yes. The Federal Aviation Administration, in a reading from section 212 of the Act, subsection A. What's the code, Satoshi? It's in the note of 49 U.S.C. 44701. Okay. The FAA shall issue regulations, comma, based on the best available scientific information, comma, to specify limitations on the hours of flight and duty time allowed for pilots to address problems relating to pilot fatigue. And the factors in subsection 2, which include the all necessary provision in sub M, are designed to inform the FAA's decision on issuing regulations based on the best available scientific information. And to allow costs to become the basis for that decision would plainly ignore Congress's direct command. You know, the intervener cited our decision in Michigan v. EPA, which you didn't respond to in your brief. Yes, Your Honor. Quote, clear congressional intent to preclude consideration of costs. It says, it is only, it says, it is only where there is clear congressional intent to preclude consideration of costs. I think that case is similar to the more recent Supreme Court Michigan v. EPA case, where there's broad language about issuing regulations that are necessary to do something. It's a broader grant of authority to issue regulations than you have here. That's one point. The second point is, it really begs the question of why did Congress put in the language, based on the best available scientific information, if not to limit consideration of the regulations to the best available information? Why didn't they say it was limited? I mean, that's a 280 sword you're asking there. If they meant it to be limited to that, why did they not say that? Well, I think based on is, while it may not be absolutely limited, it is certainly, it defines the basis for the regulation and focuses the decision-making process on that information. And why would not the language from Michigan be, I didn't like Michigan at the time, but what it stands to do is tell you what the law isn't, and the majority said what the law was. Your Honor, the language in Michigan, and if you give me a moment, I think I have it handy. The language in Michigan, again, is much broader than what we have here. And so I think any time you look at a statute, obviously, you have to look at the specific language in front of you, and that language is broad in the same way that the— I thought it was very specific in Michigan, and the majority said it has to be a clear command not to consider cost before they can't consider cost. In the face of a broad grant of authority, like to issue regulations that are necessary to accomplish something— Like it was in Michigan. Right, that's what I'm saying. In Michigan, that might not be improper—I'm not going to argue that it was improperly decided, but that makes sense in that context because you had a broad grant of regulatory authority that wasn't otherwise limited. It was otherwise limited, as I recall, in Michigan. I think you talked about the effectiveness being the—not cost effectiveness, but the most effective method of controlling the pollutant in the interstate. Right, but again, the lead-in to that was necessary or appropriate. It was a much broader grant of how do you get to that point than what you have here. I think here, it's really limited to the best available—or based on and focused on the best available scientific information. At the time that this statute was passed, the provisions you're talking about, there were executive orders in effect requiring executive agencies—the FAA is an executive agency—to consider cost-benefit analysis. Yes. Well— Yes. I think it was, so why shouldn't we assume that Congress was aware that the FAA, as an executive agency, was under an executive order whenever it passed regulations to consider cost-benefit? Why shouldn't we assume that Congress knew? Well, they may—I mean, I'm assuming that they did on some level. In that situation, one would expect that if Congress didn't want the agency to comply with the executive order, they would have said so. Except the executive orders are actually written in the opposite way, to say that if Congress says something else, then you can't base your decision on costs. Congress's language controls. And so when Congress says what they say, the first question is, have they specified the basis for regulation, and does that basis for regulation include basing it on a cost-benefit analysis? Sort of yes or no. Here, the answer we think is clearly no, and the fact that there's an executive order that says, well, nonetheless, you have to do it, is trumped by plain language of the statute here. If there are no further questions, I'll reserve any time I have left. Thank you. Thank you. May it please the Court, Mark Penick, Department of Justice. I represent the respondent, the Federal Aviation Administration. With me at counsel's table is John O'Quinn, who represents the intervening cargo carriers. The IPA wants it both ways. They want this Court to order the FAA to extend this rule, which was developed on the basis of cost justification and cost-benefit analysis, to the cargo carriers. And yet they attack the rule itself on the basis that cost justification and cost-benefit analysis is illegal. So the idea that you can extend the rule... Well, I don't understand that. I mean, that's their argument. That is their argument. Their argument, they want it extended, and they say the agency doesn't have authority to take account of cost-benefit analysis. Now, they may be right or wrong about that, but that's their argument. Yes. What's the matter with that? I mean, I'm not asking whether they're right or wrong, but I don't understand they want it both ways. Why don't you just focus on their argument, which is they say the agency has no authority to take account of cost-benefit analysis. Because... If they're right about that, then the agency will have to extend this to... Well, for the reasons we've outlined in our brief, Your Honor, that leads to absurd conclusions. You're saying that the rule as applied to passengers, carrying passengers, was itself based on the cost-benefit analysis. Correct, and it was. The same cost-benefit analysis that was used... So they want that rule applied to them, even though it was based on the cost-benefit analysis. Exactly the same analysis. That's right. And so you can't do what they've asked to do without remaining up to the agency, and this leads to the very absurd conclusions I want to address here. All right. The statute says to the agency to address problems, pilot fatigue. Now, that in itself is ambiguous. What are the problems that we have? Now, the agency deliberately excluded all pilots from that because the agency regulates pilots, everything from general aviation to student pilots to crop dusters to commuter planes to passenger airplanes and Airbus 380s. So instead they limited it to passenger carriers because that was the most cost-benefit way of proceeding because the potential benefits for doing so far outstripped, in the high-case analysis, those of the cost. They defined the benefits in terms of saving lives because the agency thought that every life on this would be assumed to be worth $6.2 million. You have an average carrier, a cargo carrier, has 3.2 people on it. The agency assumed because most of these accidents, and there's page 68 of the final supplemental regulatory impact analysis, uses the six crashes that took place during the relevant time period, the 10 years, and 112 fatalities. And they extended that in the high-case analysis to use a regional carrier's jet that had 88 seats. Now, they could have just as easily extended that to a jumbo jet carrying 400 or 800. So it's a very conservative analysis, and they potentially use it as a conservative analysis so as not to overstate the benefits. And they said, we're going to draw a line here because it doesn't make any sense to impose these kinds of costs on cargo carriers where they crash once every 10 years. And they used the Poisson probability distribution analysis to calculate what it would take for this to be cost-effective. Let me ask you something. Are there different age requirements for passenger carriers as opposed to cargo carriers for pilots? I don't know the answer to that, Your Honor. We can find that out for you. But the point is this. I thought there were. There may well be. I just don't know. Now, if you look at the criteria that the statute requires the agency to consider, it's not just any other matter that the administrator finds appropriate. But the criteria itself involves not just subsection G, which has costs by virtue of international standards, but the rest of it. For example, it says the effects of commuting, the means of commuting, and the length of the commute. Now, if you wanted to address fatigue only, you could bar commuting completely because any commute might affect fatigue. But it's the agency elected not to do that because of the tradeoffs. The same thing, subsection K, agency should consider medical screening and treatment. Now, you can conceivably require every pilot to have a blood test before they take off. There are millions of departures of cargo carriers at issue here. You still have to make sure they're not sick, and hence contributing to their fatigue. Does that make any sense? Of course not. But that could be the whole idea of having fatigue as the only criteria which we're supposed to consider. Alternatives, another is H, alternative procedures to facilitate alertness in the cockpit. Under plaintiff's, petitioner's view of the world, if there is one alternative which is more efficacious in reducing fatigue, the agency must adopt it regardless of whether it costs a million dollars more than the alternative because it means one is slightly more efficacious than the other. That's absurd. The whole idea in finding the problem is that you have to make a tradeoff. And there's nothing in this statute that... Well, it may be absurd, but if they're right that the statute's clear, right? That's the end of it. I have yet to see anything in this statute that says the agency may not consider costs. Okay, that's your argument, isn't it? Right. The argument's not that the statute doesn't clearly prohibit the agency, right? I think that my argument is that at the very least, the statute is ambiguous enough to allow the agency to engage in these tradeoffs. And if it's ambiguous enough, then the question is, on its own, whether or not the agency's construction is reasonable. And it most clearly is because without this construction, the statute leads to absurd results.  Now, I think, by the way, Congress left it to the administrator to define the relevant universe. If you look at 212B, where the agency's required to require each Part 121 carrier to submit a fatigue risk management plan, they define the universe. They do so in Section 214, 215, and 260. Each of those reference Part 121 specifically. That's not found in 212A. And it left it to the administrator's judgment, policy judgment, what was the best remedy to address problems of pallet fatigue. I mean, that's about as broad as you can get. It leads to the agency, the ability to define the problem, and it leads to the agency how to best address it, and it allows the agency, as Judge Taylor has referenced here, to consider any other matters that the administrator may find appropriate, which is about as broad as you can get. What is a Part 121 carrier? Part 121 carrier are basically the cargo carriers and the passenger carriers, including regional carriers. So it's commuter or basically agency defines the number of seats. I think nine and below is a commuter carrier. I think 30 and more is a regional carrier. The accidents that took place that are listed on page 16 of the final supplemental impact analysis were all regional carriers. There were six of them in the 10-year period. There was one cargo carrier that resulted in no fatalities. The agency did a low-base case and a high-case analysis of that and used, in the high case, bigger aircraft. A private jet is generally not? It's general aviation. It's not Part 121. That's correct. So Donald Trump's airplane would be under general aviation. So the point on this is the agency had to draw a line someplace in order to make this a rational rule. You don't impose $452 million in costs on a cargo system when you have $10 million worth of benefits. It's just irrational. If the court has no further questions, I will see the written menu by time tomorrow. That's okay. I think we're done. Did counsel have any time left? Oh, right. Sorry, we have the interviewer. Go ahead. Thank you, Judge Tatel. May it please the court. John O'Quinn on behalf of the Intervener Cargo Airlines Association. The IPA's central argument that the 2010 Act categorically prohibits the consideration of benefits and costs in determining what regulations to adopt to address the problems relating to pilot fatigue cannot be reconciled with the statute itself, the case law, or 30 years of agency practice. And to that point, Judge Randolph, you made the point that Congress here was legislating against a known background, and that is literally 30 years of agency practice, 30 years of executive orders, and indeed legislating against the background of the Supreme Court's Riverkeeper decision, which had come down just the year before, that made clear that it's generally always appropriate for an agency to consider costs. And in fact, the Michigan decision makes clear, both in the majority opinion and in the dissent, that, quote, cost is almost always relevant, and usually it is a highly important factor in regulation. Here, of course, you have a statute that does not, by its terms, prohibit the consideration of costs. Subfactor M says that the administrator may consider any other matter appropriate, appropriate being the same word that was before the Supreme Court in Michigan versus EPA and being the classic broad word that includes all relevant factors and cost is always a relevant factor. And finally, on this point, Judge Randolph, you pointed out that Section G, of course, takes into account considerations other than just science but builds into a cost, and there are other subfactors that do as well, as we highlight in our brief. H, J, K, L, all of them have cost embedded into it. So this is simply not a situation where Congress has, in any way, restricted the consideration of cost, much less clearly so, and as such we submit the petition for review should be denied. If the panel has questions, I'm happy to take them. Questions? No. Thank you. Thank you, Judge Taylor. Okay. Now. Any time left? Okay, you can have one minute. Thank you, Your Honor. I'm going to address one point because I think it's critical. When the FAA actually drafted the substance of the Part 117 regulations, they very carefully went through and considered both the science and the cost and other considerations, raising comments by the Cargo Airline Association and the other industry commenters as well as the IPA, and made a balanced decision based on costs, based on operational considerations, but fundamentally based on science that these are the regulations, the Part 117 regulations, that best reflect the science and address the problem of fatigue. Well, under your theory, wasn't that a violation of statute? No, and this is the point. We don't have a problem with the Part 117 regulations as they ended up. The problem we have is that once they did that, they then applied this essentially not quite post-decisional but after the fact cost-benefit analysis to carve cargo out of those rules, and that's what I mean by ignoring the science. They turned their back on their own analysis and based it on something else, based it on something other than science. The Part 117 process itself considered costs in the appropriate manner by saying we understand there's costs, but what does the science say? What does it take to get to safe airspace and non-fatigue pilots, which is what Congress asked us, told us to do, and that's the rule we came up with. We recognize it's going to impose some costs. We've trimmed them where we can, but this is where we end up. Then they said we're going to sort of throw all that out the window with respect to cargo because we're not going to look at the science anymore. We're going to do this cost-benefit analysis. That's our fundamental problem. That's the proper role of costs and where they exceeded it. You may have mentioned it in your brief, but I've forgotten. There was a National Academy of Sciences study that was supposed to be done. Was, in fact, that done? I don't know if that's been done. I think the time is up. That had to do with the commuting time study. I don't know if that's been done. Okay, thank you. Thank you, Your Honor. The case is submitted.
judges: Tatel, Sentelle, Randolph